# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES ex. rel.,** | ) | |
| **SAESAL REDMOND,** | ) | |
| | ) | |
| **Petitioner,** | ) | **No. 05 C 0083** |
| | ) | |
| v. | ) | **Judge John W. Darrah** |
| | ) | |
| **JOHN CHAMBERS,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner, Saesal Redmond, petitions for a writ of *habeas corpus* against the Danville

Correctional Center Warden, John Chambers, pursuant to 28 U.S.C. § 2254. Redmond's petition

raises several grounds for relief: (1) his inculpatory statements were coerced and involuntary, and

their admission at trial violated his Fourth Amendment due process and equal protection rights; (2)

the statements and discovery of the handgun were products of an illegal search and seizure; (3) his

warrantless arrest and subsequent statements were illegally premised on the discovery of a handgun

during a search of his residence; (4) ineffective assistance of trial counsel for failing to call several

disinterested alibi witnesses; and (5) ineffective assistance of appellate counsel for failing to raise

issue four in his petition for leave to appeal.[1]

## BACKGROUND

The following summary of facts are drawn from the state court record, including materials

submitted for purposes of appeal and post-conviction relief.

---

[1] The claims, as stated by Petitioner, were restated by Respondent in its response in a
condensed and reorganized manner. Petitioner has no objection to this modified statement of the
substantive issues. The Court, with some additional minor modifications, adopts this restatement
of the Petitioner's claims.

On January 28, 1998, Brian "Little Wolf" Clark was fatally shot near Paulina Street and 69th Street. On March 12, 1998, Redmond was arrested and charged with Clark's murder. Subsequently, Redmond filed pretrial motions to suppress his statement to the police as the fruit of an unlawful arrest and to suppress that same statement as having been involuntarily given and given in violation of his *Miranda* rights. Evidentiary hearings were held on the motions.

*Motion to Suppress Based on Illegal Arrest*

Chicago Police Detective Steve Buglio testified that he was assigned to investigate the fatal shooting of Clark. Detective Buglio spoke with Marilyn Hardy and Jacqueline Husband, who were not together at the time of the shooting but who were in the same location. Hardy stated that she saw a four-door, light-colored car, possibly gold, pull up shortly before the victim was killed and pull away very shortly after the victim was shot. Husband stated that she observed a gold-colored car in the area before and after the shooting and that she saw the victim walking with an African-American female shortly before the gunshots. Husband saw the female and the victim turn southbound onto Paulina Street from 69th Street just before the shooting. Mary Elmore, another witness, stated that she heard two gunshots and saw a light-colored, cream-colored or gold car drive southbound. Detective Buglio listed the "possible suspect's vehicle" as a light-colored, four-door, newer model General Motors-type vehicle. Another witness, R. Johnson, tentatively identified Clint Woods in a photographic array as the person she saw with the victim prior to the shooting.

In the early morning hours of March 10, 1998, Detective Buglio spoke with Clint Woods, Redmond's cousin, who was in custody on an unrelated driving-under-the-influence charge. Woods denied any knowledge of the shooting. In a second conversation with two other detectives, Woods admitted that he sold Clark 4-1/2 ounces of cocaine on the night of the shooting. Woods again

2

insisted he had nothing to do with the shooting. Woods then took a polygraph test which indicated deception. Woods was placed under arrest on March 10, 1998.

In the early evening hours of March 11, 1998, Woods told Detective Buglio that Redmond shot Clark with a .40 caliber semi-automatic handgun that Redmond kept either in his car or bedroom. Two .40 caliber shell casings were found at the scene of the shooting. Woods also told Detective Buglio that he observed Redmond and Clark together at the Red Shoe Lounge and then saw them get into Redmond's black, two-door, 1991 Buick Riviera prior to the shooting. Redmond had told Woods that he was going to rob Clark. Later that night, after 10:30 p.m., Woods saw Redmond without Clark. Redmond told Woods, "It's been one for Shorty," meaning that Clark was dead. Woods also stated that Redmond appeared to be spending more money after that night.

Detective Buglio was aware that Woods had been arrested numerous times and that Woods was a "New Breed" gang member. Detective Buglio was also aware that Woods had sold Clark cocaine the night of the shooting and that Woods' previous polygraph test indicated that Woods was deceptive.

After checking police records, Detective Buglio obtained Redmond's current address. Shortly before midnight, March 11, 1998, Detective Buglio and five other police detectives, in three cars, went to Redmond's current residence, which was Redmond's sister's apartment. Detective Buglio and three of the police detectives went to the second floor apartment. At that time, Redmond came out of the apartment and then went back into the apartment. Using a flashlight, Detective Buglio knocked on the door. After a period of time, Redmond's sister answered the door. The detectives asked if Redmond was there, and she said "Yes" and let the officers into the foyer.

3

The detectives entered the apartment without their guns drawn. The detectives asked to speak with Redmond, who came out of a bedroom. Detective Buglio asked Redmond to go outside to speak about his cousin, Clint. Redmond asked why; and Detective Buglio stated, "Well, I don't want to state in front of the females what it's about. It's your business to tell them if you want to." Redmond agreed to go with the detectives. Detective Buglio went with Redmond into Redmond's bedroom where Redmond changed clothes. Detective Buglio escorted Redmond down to his unmarked police car and placed Redmond in the backseat. Redmond then gave Detective Buglio permission to search his vehicle. The police reports do not indicate that Redmond consented to go with the detectives or to a search of his vehicle.

According to Detective Buglio, Redmond was not under arrest and was free to leave. Detective Buglio did not inform Redmond that he was free to leave. Redmond was not handcuffed, and the detectives did not have their guns drawn. The doors of the police car were locked; and another detective in the car, James Riley, testified that Redmond was not free to leave the car.

After searching Redmond's vehicle, Detective Buglio went back to the apartment and asked Redmond's sister, Arriane, if he could search her apartment. Redmond's sister consented, and Detective Buglio prepared a consent to search form. Arriane signed the form; and Crystal Archie, Redmond's girlfriend, signed the consent as a witness. Arriane was informed that she had the right to refuse to sign the form. According to Detective Buglio, no detectives threatened Arriane with the loss of her apartment or her children. Twenty-five minutes had passed from the time the detectives arrived at the apartment and the time the consent to search was signed.

At least four detectives searched the apartment. Detective Buglio recovered a .40 caliber handgun from between Redmond's bed's top-padding and the box spring in Redmond's bedroom.

4

Afterward, at 12:05 a.m. on March 12, 1998, Detective Buglio went to the police vehicle and placed Redmond under arrest. At this time, Redmond was handcuffed. Twenty to thirty minutes had passed from the time Redmond was led out of the apartment and the time he was formally placed under arrest.

Detective Riley testified that he and five other detectives arrived at Redmond's apartment on March 11, 1998. Redmond was placed, unhandcuffed, in the back seat of an unmarked police car. The car's doors were locked, and Redmond was not free to leave. While in the car, Redmond consented to the search of his car.

Detective Thomas Kelly testified that he was one of the detectives dispatched to Redmond's residence on March 11, 1998. No guns were drawn while the detectives were in the apartment. Detective Buglio had asked Redmond if he would step outside the apartment, and then Redmond walked outside. Detective Buglio asked Redmond's sister to sign a consent to search form after it was determined that she was the leaseholder. Detective Buglio filled out the form; and Redmond's sister signed the form and dated it March 12, 1998. Archie also signed the form as a witness. The consent was signed prior to the search.

Redmond testified at the hearing that five police officers arrived at his home around midnight on March 11, 1998. Two of the police officers had their guns drawn. Redmond was placed under arrest and handcuffed while in the kitchen. Redmond was not committing a crime at the time of his arrest; and he was not read his *Miranda* rights. Redmond was not presented with a warrant, and he did not give the police officers permission to search his vehicle or the apartment. After refusing to a search of his vehicle, a police officer took the keys from Redmond's pocket and searched Redmond's vehicle. After about thirty-five to sixty minutes, he was taken to the police station.

5

Arriane, testified that about five minutes before midnight on March 11, 1998, she was sleeping in a bedroom closest to the door of her apartment. She was awakened by a loud knocking at the door. Arriane went to the door and asked who it was; a man stated it was the police. When Arriane opened the door, one police officer stated that they were looking for Redmond and asked if he was there. Arriane stated he was there, and the police officers entered her apartment without her permission. There were six police officers in all, and four of the officers had their guns drawn. After Redmond came out of his bedroom, he was allowed back into the room to put on his jeans and a jacket. When he entered the kitchen, Redmond was handcuffed and taken outside the apartment.

Arriane did not consent to a search of her apartment and did not object during the search because the officers had their guns drawn and her children were asleep in the apartment. The apartment was searched for approximately an hour and fifteen minutes.

At some point, a police officer asked Arriane who the leaseholder on the apartment was. Arriane was told that she could lose her apartment and her children. After the gun was found, Arriane showed the police her lease and a state identification card. She was then asked by Detective Buglio to sign a white sheet of paper. Arriane did not know what she was signing and thought that her signature was for comparing her signature with her identification card. None of the blanks on the sheet were completed. She signed the sheet of paper and wrote down the date of March 12, 1998. Archie signed the paper after Arriane.

The trial court denied Redmond's motion to quash his arrest and suppress evidence. The trial court found that the police were given "strong enough information" that they should investigate Redmond after speaking with Woods. The trial court found that Redmond was not under arrest when he was placed in the police car. The trial court did not find Arriane's testimony that she did not

6

know what she was signing when she signed and dated the consent form credible in light of her age and background. Further, the police had written consent to search the premises and a tip that was corroborated when the gun was found in Redmond's bed.

*Motion to Suppress Statement Based on Involuntariness*

The trial court then conducted a hearing on Redmond's motion to suppress his statement made after his arrest. Detective Buglio testified that he interviewed Redmond in an 8-by-10-foot, windowless room between 1:00 and 2:00 a.m. on March 12, 1998. Detective Buglio was alone with Redmond and advised Redmond of his *Miranda* rights from a preprinted card in his wallet. Redmond stated that he understood his rights and that he wanted to answer the questions. Detective Buglio was in the interview room for only approximately six minutes when he was interrupted and left the interview.

Between 2:00 and 3:00 a.m., Detective Buglio and Detective Jean Romic interviewed Redmond. Redmond did not state that he wished to remain silent or that he wanted an attorney. No threats to arrest Redmond's girlfriend were made. Redmond was not handcuffed while in the interview room. Redmond denied any involvement in Clark's murder.

At 4:00 a.m. on March 12, 1998, Redmond was interviewed by Detectives Romic and Buglio and Assistant State's Attorney ("ASA") Joan Pernecke for approximately thirty minutes. Pernecke explained her role as an ASA and that she was not Redmond's attorney. She informed Redmond of his *Miranda* rights. Redmond did not state that he wished to remain silent nor did he request an attorney. No threats to arrest Arriane were made. Redmond did not ask to make a phone call, and he was not told the police or ASA would help him if he signed a statement. Redmond again denied any involvement in Clark's murder.

At approximately 8:00 p.m. on March 12, 1998, Detective Buglio and ASA Ignatius Villasenor interviewed Redmond for approximately fifteen minutes. Redmond appeared to have been sleeping. Detective Buglio asked Redmond "if he had remembered anything else or if he wanted to talk about anything." Redmond stated that he had nothing to add to his previous denial of responsibility. Detective Buglio gave Redmond a hamburger, fries, and soda.

Detective Buglio and Detective Bunch interviewed Redmond again at approximately 11:00 p.m. on March 12, 1998. During this interview, Detective Buglio told Redmond that they had facts that differed from his version of events. They showed Redmond a copy of Woods' signed statement, implicating Redmond in the murder; Detective Buglio did not allow Redmond to actually read the statement.

Between 2:00 and 3:00 a.m., March 14, 1998, Detective Buglio and ASA Villasenor interviewed Redmond again. At 4:00 a.m. that same day, Redmond was moved to a room with a table so that Redmond's statement could be written out by ASA Villasenor.

Detective Buglio testified that Redmond never asked for an attorney and that Redmond actively maintained his innocence for the first 50-and-1/2 hours of his detention. Detective Buglio never threatened to arrest Redmond's girlfriend and never threatened Redmond in any manner. Detective Buglio never provided a written *Miranda* rights form to Redmond despite their availability within the police department. Detective Buglio stated he may have raised his voice during some of Redmond's interrogations.

Detective Romic testified that Redmond was transported to the police station at 1:00 a.m. on March 12, 1998. Redmond was locked for the next fifty hours in an 8-by-10-foot interview room that had no windows, clock or telephone and contained a steel bench. Detectives Romic and Buglio

8

briefly interviewed Redmond around 3:30 a.m. on March 12, 1998. Detective Buglio read Redmond his *Miranda* rights, and Redmond denied any involvement in the murder. At this time, Redmond had not been offered the opportunity to use a telephone.

At approximately 4:00 a.m. on March 12, 1998, Detectives Romic and Buglio and ASA Pernecke interviewed Redmond. Redmond was read his *Miranda* rights, and Pernecke told Redmond that she was an ASA and not his attorney. This interrogation lasted approximately a half-hour. Redmond denied any involvement in Clark's murder. Later that morning, Detective Romic brought Archie to the police station for questioning.

Detective Romic testified that Redmond never stated that he wished to remain silent and that he never asked for an attorney. No one threatened to arrest his girlfriend, Archie. Detective Romic knew that Archie was at the police station the morning of March 12, 1998, but could not recall if she allowed Archie to see Redmond or whether Redmond was ever informed that Archie was at the police station.

At 10:45 a.m. on March 12, 1998, Detective Romic took Redmond to 11th and State Street; they returned to Area One at approximately 12:30 p.m. At that time, Detective Romic asked Redmond if he wanted anything to eat or drink or if he needed to use the bathroom. Detective Romic could not recall Redmond's response or whether any food or drink were supplied to Redmond or whether Redmond used the bathroom.

ASA Pernecke testified that she, along with Detectives Romic and Buglio, interviewed Redmond at 4:00 a.m. on March 12, 1998. ASA Pernecke read Redmond his *Miranda* rights, which he did not exercise. The interview lasted between thirty and forty minutes. Redmond maintained his innocence throughout the interview.

9

At 5:30 a.m., ASA Pernecke asked detectives to bring Archie to the police station. Detective Romic brought Archie to the police station, and she was interviewed by ASA Pernecke at approximately 6:15 a.m. Archie was not handcuffed, and ASA Pernecke did not consider Archie under arrest. ASA Pernecke questioned Archie about her knowledge of the gun found in Redmond's bedroom. Detective Romic was present during the interview. In her presence, no one threatened Redmond with Archie's well-being. ASA Pernecke did not recall seeing Redmond eating any food or being taken to the bathroom. ASA Pernecke left the police station at approximately 7:30 a.m. on March 12, 1998.

ASA Susan Ziegler testified that she and Detective Doroba interviewed Redmond at 4:25 p.m. for approximately 30 to 35 minutes and at 7:00 p.m. for approximately 10 minutes on March 12, 1998. Redmond was read his *Miranda* rights and was not handcuffed. Redmond did not exercise his *Miranda* rights.

On March 13, 1998, ASA Ziegler briefly spoke with Redmond at 6:00 a.m. for approximately two minutes. When she entered the interview room, it appeared that Redmond had been sleeping. ASA Ziegler and Detective Dedore briefly interviewed Redmond again at 11:00 a.m. for approximately ten minutes. Redmond did not complain about any mistreatment. She did not see Redmond eating any food and never saw him taken to the washroom.

ASA Villasenor testified that she questioned Redmond five separate times from 5:30 p.m. on March 12, 1998 and 4:05 a.m. on March 14, 2005. Villasenor never saw Redmond receive food or actually eat anything. The door to the interview room was continuously locked. He never heard anyone tell Redmond that his girlfriend was going to be charged with possession of the gun found in his bedroom if he did not cooperate.

10

ASA Villasenor and Detective Doroba spoke with Redmond at 5:30 p.m. on March 12, 1998. Villasenor read Redmond his *Miranda* rights. Redmond then gave a half-hour oral statement, denying any responsibility for Clark's murder. Redmond did not ask to use the telephone to contact an attorney, did not ask to speak to an attorney, and did not state he was unwilling to talk. ASA Villasenor and Detective Doroba again spoke with Redmond for approximately fifteen minutes at approximately 1:00 a.m. on March 13, 1998. The lights were off in the interview room when they entered, and ASA Villasenor assumed they had awakened Redmond from sleep when he rubbed his eyes. Redmond never asked for an attorney, never asked to use a telephone, and never stated he was unwilling to talk. Redmond again denied any involvement in Clark's murder.

At approximately 8:15 p.m. on March 13, 1998, ASA Villasenor and Detective Buglio again interviewed Redmond for approximately forty minutes. Redmond was advised of his *Miranda* rights. Redmond denied any involvement in Clark's murder and asked for some food. ASA Villasenor did not see Redmond get the food or actually eating. At approximately 10:00 p.m. that same evening, ASA Villasenor spoke with Redmond. The lights were off in the interview room when ASA Villasenor entered the room, and Redmond was lying down on the bench. Redmond appeared tired. ASA Villasenor spoke with Redmond for approximately five minutes, and Redmond again denied any responsibility in Clark's murder.

At 2:30 a.m. on March 14, 1998, ASA Villasenor and Detective Buglio again interviewed Redmond. ASA Villasenor could not remember whether the lights were on or off when they entered the room, whether Redmond had been sleeping or whether Redmond appeared tired. ASA Villasenor showed Redmond the written statement of Woods and informed Redmond that Woods' statement conflicted with Redmond's statement. Redmond then "made a change in what he had been

11

telling us previously." Redmond pointed to Woods' statement and stated that he wanted "to do one just like that." He was not allowed to read Woods' statement. Redmond was also shown photographs of Woods and Clark.

Redmond was moved to a "line-up room," where he gave an oral statement until approximately 4:00 a.m. Prior to the handwritten statement, Redmond signed the pre-printed *Miranda* rights. Occasionally, ASA Villasenor was in the room alone with Redmond. At these times, Redmond stated that he had been treated "fine" by ASA Villasenor and the police officers involved and that he had never been threatened. Redmond's statement was written out by ASA Villasenor in Redmond's presence. Redmond told ASA Villasenor that he had been given soda-pop and water to drink, and chips, fries, and hamburgers to eat. Redmond stated that he had been allowed to talk with his girlfriend on the telephone. Redmond signed the statement at 4:05 a.m. on March 14, 1998, fifty-two hours after his initial arrest.

Redmond testified that at approximately 12:30 a.m. on March 12, 1998, he was locked inside an 8-by-10-foot interrogation room that was furnished with a steel bench and two chairs. The room did not have windows or a clock. Prior to signing a written statement, Detective Buglio had repeatedly told Redmond that if he did not cooperate he would charge his girlfriend with possession of a handgun and charge Redmond with first-degree murder. Redmond denied knowing anything about Clark's murder. Redmond only signed the statement after Detective Buglio again threatened to arrest his girlfriend. While ASA Villasenor was writing out Redmond's statement, ASA Villasenor repeatedly looked at Woods' written statement and conferred with Detective Buglio. Redmond had no input into the statement.

12

During the fifty-two hours of interrogation, Redmond was taken to the restroom five times. He was taken to 11th Street and State Street for a lie-detector test. He was also taken into a larger room before his statement was written. His total time outside of the interrogation room was approximately an hour-and-a-half. He was allowed to make one telephone call to his home for two minutes. He was repeatedly denied access to a telephone.

Redmond repeatedly asked to speak to an attorney, including immediately after he arrived at the police station. The entire time he was interrogated, he was given a bag of chips and a soda to drink. These items were taken away from him when he reiterated that he knew nothing about Clark's murder. He was only able to sleep for four hours, on and off, over the fifty-two hour period. His segments of sleep consisted of fifteen minutes to, at best, a half-hour.

Detective Buglio told Redmond that his girlfriend had been brought to the police station and that Redmond could not see or speak to her. Detective Buglio took Redmond to a room where he could hear his girlfriend's voice.

At one point, a detective grabbed Redmond by the neck and slammed him against a wall. Another detective in the room stated, "That wasn't necessary." Redmond was often cursed at in an angry and loud tone of voice. He was shown a statement and told that he had been implicated in Clark's murder. He was given his *Miranda* rights once, before he took the lie-detector test the morning of March 12, 1998. He was also placed in line-ups the afternoon of March 12, 1998.

Archie, Redmond's girlfriend, testified that three plain-clothes police officers took her to the police station at approximately 6:00 a.m. on March 12, 1998. A female police officer told Archie, "We have some questions for you, and Saesal would like to talk to you down at the station. You need to come with us." The police officers also told her that she "needed" to answer some questions

about a gun. A police officer followed Archie to her bedroom while Archie changed clothes. After Archie went to the bathroom, Archie opened the door, and a police officer was standing outside the bathroom door and holding Archie's jacket. The female police officer then searched Archie's jacket. Archie was escorted out of the apartment and into the back of an unmarked squad car by the three police officers. Archie was not handcuffed. Archie told the police officers that she had to be in school.

Archie was placed in a windowless room at the police station. Two other females were also in the room. Archie was not read her *Miranda* rights. The two females asked Archie from where did the gun found in Redmond's bedroom come and "whose was it." The females repeatedly told Archie that if she didn't have any answers, then somebody had to come up with some. They told Archie that the gun "could" belong to her. The questioning lasted approximately an hour, but she was not taken home until noon. The door to the room was not locked, but she was repeatedly told to "wait" when she told the females that she needed to get to school. Archie received a telephone call from Redmond between 3:00 and 3:30 p.m. on March 13, 1998.

The trial court denied Redmond's motion to suppress his statement. In its ruling, the trial court noted that several witnesses testified that Redmond had been advised of his *Miranda* rights, though Redmond asserted that he had not been advised of his rights. As to the fifty-two hours in custody, the trial court noted that there were two defendants involved in the case, a polygraph exam, and a witness to be interviewed during that time. The trial court reasoned that fifty-two hours in custody could be "more than enough time to be in custody" when taking the "sleeping patterns" into

14

account. However, the length of time in custody was only one factor and not enough to suppress the statement. Furthermore, while there was conflicting testimony concerning the food provided, the trial court did not "believe that it had reached a point where the statement could be suppressed."

Following the denial of his motions, Redmond waived his right to a jury trial; and the case proceeded to a bench trial, where the following evidence was adduced.

The parties stipulated that Clark died as a result of multiple gunshot wounds to the head. ASA Villasenor testified as to Redmond's March 14, 1998 written statement. During the statement, Redmond identified photographs of Woods, Clark, and the gun. Redmond signed each page of the statement and was allowed to make changes, corrections or additions to the statement which he then initialed.

In the written statement, Redmond stated that on January 28, 1998, he met with Woods at the Right Shoe Lounge. Redmond had known Woods for fifteen years – so long, that they called each other cousins. Redmond drove his 1992 black Riviera to the lounge, and Woods drove his van to the lounge. Redmond and Woods met in the parking lot of the lounge. When Woods got out of his van, Redmond saw Woods take a black .40 caliber gun from the front of his pants and move it to the side of his pants. Redmond had seen the gun at Woods' house at least three to four times before. Redmond and Woods went into the lounge together. About fifteen minutes later, Wolf (Clark, the soon-to-be victim) came into the lounge. Redmond had met Wolf through Woods about six months previously.

Woods and Wolf sat at a table and talked for approximately five minutes. Woods then asked Redmond to join them. Woods stated that he had a "lick," meaning a robbery of some jewelry or

money from someone. Woods asked Redmond to be security, meaning he would be the look-out for the police. Redmond asked Woods where the lick was and whom they were going to rob. Woods stated that the lick would be in the neighborhood and that Redmond would not know the person.

The three men planned the robbery for thirty to forty minutes. Woods and Wolf would go into the house. They would be able to get between $10,000 and $20,000 because the guy at the house sold drugs. If they got $20,000, Woods and Wolf would each get $8,000; and Redmond would get $4,000. Redmond agreed to take part in the robbery because he could use the money. After Woods made a telephone call, the three men left the lounge.

Woods stated that they would use Redmond's car because it was dark and nobody knew the car. Woods asked for the keys and directed Wolf to sit in the front passenger seat and Redmond to sit in the backseat while Woods drove. Woods drove to an alley off of 69th and Paulina Streets, where he turned the car around and parked the car facing northbound in front of a garage at 6911 South Paulina. Woods told Redmond to stay in the car while he and Wolf did the rest.

Woods and Wolf exited the car and walked into the alley together, where they stayed for approximately two to three minutes. There were some people walking around the block, but Redmond did not know them. Woods and Wolf came out of the alley, stood on the sidewalk, and then Woods walked back to the car. By this time, Redmond had moved to the driver's seat of the car. Woods turned back around and walked back to Wolf on the sidewalk. Woods walked up behind Wolf, pulled out the .40 caliber handgun, and twice shot Wolf in the head. Wolf fell to the ground.

Woods put the gun back into his waistband and then went through Wolf's pockets. Woods took money out of Wolf's front pants pocket and put the money in his pants pocket. Woods told Redmond, "Let's go," and sat in the passenger side of the car. Redmond drove north on

Paulina Street to 68th Street and then back to the lounge. On the way, Redmond asked Woods why he shot Wolf because he thought the lick was supposed to be a house and not a person. Woods stated that Wolf was the lick because he owed Woods $4,000.

In the lounge parking lot, Woods offered Redmond some of the money he had taken from Wolf. Redmond stated he did not want the money because he was not part of the plan. Woods and Redmond stayed at the lounge for approximately fifteen minutes. They then went to the parking lot; and Woods asked Redmond to "put the gun up for him," meaning to take the gun home and hide it. Redmond took the gun home and hid it inside his box spring of his bed.

At the end of his statement, Redmond stated that he had been treated well by the police officers and the ASAs. Redmond was given food to eat and soda and water to drink. He was allowed to use the bathroom whenever he needed and allowed to sleep when tired. He was also allowed to use the telephone to speak with his girlfriend. He stated that no promises or threats were made to induce his statement, which he made voluntarily, while free from the effects of alcohol or drugs.

Detective Buglio testified that he recovered a handgun from Redmond's box spring mattress.

After the close of the State's case-in-chief, Arriane, Redmond's sister, testified that Redmond was home on January 28, 1998, from approximately 6:30-7:00 p.m. until 4:15 the next morning, when he went to work. At approximately 9:25 p.m. on January 28, 1998, Arriane borrowed Redmond's car. She returned to the apartment at approximately 10:05 p.m. She placed the car keys on Redmond's dresser; Redmond was asleep at that time. Arriane saw Redmond leave for work the next morning at 4:15 a.m. because she was already awake in anticipation of receiving her first child at 4:30 a.m. for babysitting.

Archie, Redmond's girlfriend, testified that Redmond came home on January 28, 1998, between 6:00 and 7:00 p.m. Redmond took a bath, watched the kids for a while, and then went to bed. When Archie went to bed at 10:30 p.m., Redmond was already asleep in their room. Redmond awoke the next morning at approximately 4:00 a.m. to go to work.

Redmond testified on his own behalf. He denied making the statement attributed to him by the State. The only thing that Redmond had told the police was that Woods had sold him the gun for $200 around February 16, 1998, after someone had tried to break into Redmond's apartment. Redmond had been repeatedly threatened that, if he did not sign the statement, the police would arrest his girlfriend and charge her for possession of the gun.

Redmond denied ever being present at the Right Shoe Lounge on the night in question. He denied taking any part in the planning of the robbery or the killing of Clark. Redmond testified that on the evening of January 28, 1998, he came home from work at approximately 6:00 to 7:00 p.m. He did not leave the apartment until the next morning to leave for work.

The trial court found Redmond guilty of murder based on accountability. The trial court found Redmond's written statement to be credible and that, while Redmond did not share the criminal intent with Woods, he was accountable for the murder based on his participation in a common scheme. Redmond was subsequently sentenced to twenty-two years' imprisonment.

### State Court Appeals

Redmond appealed his conviction to the First District Illinois Appellate Court, raising seven issues: (1) the trial court erred in finding he voluntarily agreed to leave his apartment and accompany the police; (2) he was illegally seized without probable cause when he was locked in a squad car; (3) the officers lacked probable cause to arrest him after discovering a handgun in his bedroom; (4) his

written statement was involuntary after spending fifty-two hours in custody and being interrogated fourteen times while not receiving adequate food and sleep; (5) even if the statement was voluntary, it was the product of an illegal arrest; (6) the State failed to prove beyond a reasonable doubt that he was accountable for murder; and (7) trial counsel was ineffective for failing to call certain witnesses to corroborate Redmond's testimony and alibi. On June 30, 2003, the Appellate Court affirmed Redmond's conviction.

Redmond sought leave to appeal in the Illinois Supreme Court, raising three issues: (1) his statement following his illegal arrest was involuntary because he was taken from his bed in the middle of the night to go to the police station where he was interrogated for fifty-two hours; (2) the illegality of the warrantless and involuntary seizure was not vitiated by the subsequent discovery of the handgun; and (3) his statements were involuntary when he was in custody for fifty-two hours and interrogated multiple times. On October 7, 2003, the Illinois Supreme Court denied Redmond's petition for leave to appeal.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") has modified the role of the federal court in reviewing state prisoner habeas applications to prevent "retrials" and to ensure that state court convictions are given effect to the extent possible under the law. *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000) (*Williams*). A federal court will not grant habeas corpus relief on any claim adjudicated on the merits by a state court unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A writ of *habeas corpus* may issue under the "contrary to" clause if the state court applied a rule different from the governing law set forth in the United States Supreme Court's cases or if the state court decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06. The court may issue a writ under the "unreasonable application" clause if the state court correctly identifies the governing legal principle of the United States Supreme Court but unreasonably applies it to the facts of the particular case. *Williams*, 529 U.S. at 407-08. The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable; an unreasonable application is different than an incorrect application. *Williams*, 529 U.S. at 409-11. The burden falls on the petitioner to demonstrate that he is entitled to the relief sought. *See Woods v. Visciotti*, 537 U.S. 19, 25 (2002) (*Visciotti*). Furthermore, there is a presumption that the state court knows and follows the rules of federal constitutional law. *See Visciotti*, 537 U.S. at 24.

A habeas corpus petition must survive procedural default before a federal court may address the merits of the petition. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (*Coleman*). Generally, there are two ways a procedural default occurs: (1) where the petitioner fails to raise a federal constitutional issue in the state courts (*Bocian v. Godinez*, 101 F.3d 465, 469 (7th Cir. 1996)); and (2) when a state court rejects a petitioner's claim pursuant to an adequate and independent state procedural or substantive ground (*Coleman*, 501 U.S. at 729-30).

A petitioner may be excused from a procedural default if he or she can demonstrate cause for

the default and actual prejudice as a result of the alleged violation of federal law, or a failure to review the claim will result in a fundamental miscarriage of justice. *Schaff v. Snyder*, 190 F.3d 513, 526 (7th Cir. 1999). Cause sufficient to excuse a procedural default is defined as "some objective factor external to the defense" which precludes the petitioner's ability to pursue his or her claims in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (*Murray*). Ordinarily, this requires a showing of some external impediment preventing counsel from constructing or raising the claim. *Murray*, 477 U.S. at 488.

To demonstrate a fundamental miscarriage of justice, the petitioner must show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (*Schlup*), quoting *Murray*, 477 U.S. at 496. Thus, the petitioner must show "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.

## ANALYSIS

Redmond's claims are condensed and organized below for clarity.

### *Illegal Seizure and Arrest*

Redmond argues that the state court erred in finding that he was unlawfully arrested without probable cause at his home and when he was placed in the squad car. The Appellate Court found that the determination of whether Redmond was in custody involved an objective analysis of the circumstances surrounding the interview as a reasonable and innocent person in the defendant's position would perceive them. If an individual voluntarily accompanies police officers, he has not been arrested and has not been seized. As to whether Redmond voluntarily went with the police officer to the squad car, the Appellate Court recognized that there was evidence supporting the

state's and Redmond's position but held that the trial court's finding that Redmond went with police freely was not against the manifest weight of the evidence.

As to whether Redmond was unlawfully seized after being escorted out of the apartment and placed into the backseat of a squad car, the Appellate Court again noted that there was conflicting testimony as to whether Redmond was handcuffed and whether he could exit the unmarked squad car. In light of the conflicting testimony, the trial court was in the best position to determine the credibility of the witnesses. The weight given to the testimony by the trial court must be given deference absent a clear abuse of discretion. The Appellate Court held that the trial court's determination relative to whether Redmond was seized prior to his arrest was not a clear abuse of discretion.

Looking at the totality of the circumstances, the Appellate Court found that the trial court's determination that the police had probable cause to arrest Redmond was not against the manifest weight of the evidence in light of the police officers' knowledge that Redmond had been implicated in a murder involving a .40 caliber handgun, the existence of .40 caliber handgun shell casings at the scene, and the discovery of a .40 caliber handgun in Redmond's mattress.

The Fourth Amendment provides the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that the evidence obtained in an unconstitutional search or seizure was introduced at trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). A defendant receives a full and fair opportunity to litigate his Fourth Amendment claim if (1) he has clearly had an opportunity to inform the state court of the factual

22

basis of his claim and has argued that those facts constitute a violation of his Fourth Amendment rights, (2) the state court has thoroughly and carefully analyzed the facts, and (3) the state applied the proper constitutional case law to the facts. *See Hampton v. Wyant*, 296 F.3d 560, 563 (2002) (*Hampton*). An error itself does not justify relief under *Stone*; it takes an "egregious error" to imply that the state court closed its ears and minds to an argument to justify relief. *See Hampton*, 296 F.3d at 564.

In the instant case, Redmond clearly had an opportunity to inform the state court of the factual basis of his claim, and he clearly argued those facts. Redmond also presented the facts and argument before the Appellate Court and Illinois Supreme Court. While Redmond disagrees with the trial court's and the Appellate Court's conclusions, the state courts thoroughly and carefully reviewed the facts and applied the proper constitutional law to those facts. *See Hampton*, 296 F.3d at 564 (an error, no matter how obvious, matters only in conjunction with other circumstances that imply refusal by the state courts to take seriously its obligation to adjudicate Fourth Amendment claims). Accordingly, federal habeas corpus relief may not be granted based on Redmond's Fourth Amendment claims.

## Voluntariness of Statement

Redmond argues that his statement to the police was involuntary due to the coercive conditions under which the statement was made and signed. The test applied by the Appellate Court in determining whether Redmond's statement was involuntary was whether, under the totality of the circumstances, the statement was made freely, without compulsion or inducement, with consideration given to the characteristics of the accused and the length of the interrogation. Following a review of the motion hearing testimony and the trial court's findings, the Appellate

Court held that "[a]fter a thorough review of the record," the trial court's decision was not against the manifest weight of the evidence. Furthermore, Redmond's argument that the statement should have been suppressed as the fruit of the illegal seizure and arrest was moot in light of the Appellate Court's holding that Redmond had not been illegally seized or arrested.

The test whether a defendant's confession was voluntary is whether the confession was the product of an essentially free and unconstrained choice by the defendant. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (*Schneckloth*). The court must examine the totality of the circumstances in determining whether the confession was voluntary. Relevant factors include the age of the defendant, his lack of education or low intelligence, the lack of any advice to the defendant of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *See Schneckloth*, 412 U.S. at 226.

A reviewing habeas court makes an independent, *de novo* determination of the voluntariness of a confession. *See Pharr v. Gudmanson*, 951 F.2d 117, 119 (7th Cir. 1991). However, findings of fact by the state court are entitled to deference and are presumed correct if they are made after a hearing on the merits and are fairly supported by the record. *See Armstrong v. Young*, 34 F.3d 421, 426 (7th Cir. 1994) (*Armstrong*). This presumption applies not only to the state court's express factual findings but also to the implicit resolution of facts in dispute that can be fairly inferred from the state court record. *See Armstrong*, 34 F.3d at 426. Thus, if the state court reaches a conclusion that is contrary to one version of the operative facts, the court is permitted to infer that version was

rejected. *See Armstrong*, 34 F.3d at 426. Furthermore, federal habeas courts cannot substitute their own judgment of a witness's credibility for that of the state court. *See Maggio v. Fulford*, 462 U.S. 111, 113 (1983).

In the instant case, the state courts applied the proper test for voluntariness of Redmond's confession; thus, they were not acting contrary to applicable law. Redmond argues that the state courts applied the correct test but did so unreasonably.

Certain factors weigh in favor of a finding that Redmond's confession was involuntary. Redmond was interrogated several times over a fifty-hour period – most of this time he was confined to a 8-by-10-foot, windowless room that only contained two chairs and a steel bench. Furthermore, while Redmond did sleep and receive some food during this time, the amount of both sleep and food was minimal in light of the extended duration of the interrogation.

Redmond also cites as evidence that his confession was involuntary: (1) his testimony that food was taken away from him, (2) that he was repeatedly cursed at and threatened with the arrest of his girlfriend, (3) that he only received his *Miranda* rights once, and (4) that he was grabbed by the neck by a detective. This testimony was contrary to that of all the police officers and ASAs then present. While the state court did not specifically address all these factors, it did indicate that it took into consideration all of the evidence. The court's conclusion contrary to Redmond's version, in both the motion to suppress and the bench trial, implies that the trial court rejected Redmond's testimony in this regard.

The Government argues the following evidence supports a finding that the confession was voluntary. Redmond was thirty-two years of age at the time that he confessed; and there is no evidence that Redmond's intelligence, physical condition or mental health were impaired. Redmond

acknowledged to ASA Villasenor that he was treated well and allowed to call his girlfriend. ASA Villasenor testified that Redmond did not advise ASA Villasenor that any police officers abused him. The trial court also found Villasenor's statement credible, and the statement indicated that Redmond was treated well while in custody. Several police officers and the ASA testified that Redmond received and understood his *Miranda* rights; and Redmond testified that he received his *Miranda* rights on March 12, 1998, prior to making and signing the statement.

The factors cited by Redmond discussed above weigh against the voluntariness of the confession and may have been sufficient to support suppression of the confession on appeal. However, the state courts stated that they weighed all relevant factors and, after doing so, concluded that Redmond's confession was voluntary. This Court may only set aside the finding of the state courts if the state courts' determinations were unreasonable. *Williams*, 529 U.S. at 411. A consideration of all relevant factors here satisfies the lenient test of "reasonableness" and supports a finding that the confession was voluntary. *See Hardaway v. Young*, 302 F.3d 757, 767-68 (7th Cir. 2002) (*Hardaway*) (reversing district court's grant of habeas petition because the balance of factors regarding whether confession was voluntary was close enough that the state courts' decisions were reasonable). In light of the deferential standards of review under the AEDPA, the court defers to the findings and the conclusions of the state courts. *See Hardaway*, 302 F.3d at 768. Accordingly, Redmond's habeas petition is denied on this ground.

### *Ineffective Assistance of Counsel*

Redmond argues that he received ineffective assistance of trial counsel because trial counsel failed to call several disinterested alibi witnesses. Redmond also argues that he received ineffective

assistance of appellate counsel because appellate counsel failed to raise the ineffective assistance of counsel in Redmond's petition to the Illinois Supreme Court.

The Government argues that Redmond's claims of ineffective assistance of trial and appellate counsel are procedurally barred because they were not presented to the Illinois Supreme Court or in a state post-conviction. Furthermore, Redmond has failed to show he should be excused from procedural default on these claims.

Before seeking federal habeas relief, a state prisoner must fairly present his claims in each appropriate court. *See Baldwin v. Reese*, 541 U.S. 27 (2004). Here, Redmond did not present his claim of ineffective assistance of trial counsel to the Illinois Supreme Court and has not raised the issue of ineffective assistance of appellate counsel in a state post-conviction petition. To avoid procedural default, a petitioner must show: (1) cause for the default and actual prejudice or (2) a failure to consider his claims is a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Redmond concedes that his ineffective assistance of counsel claims are procedurally barred but argues that the procedural bar should be excused because he can show cause for the default and actual prejudice as a result of the alleged violation of federal law. Redmond does not allege and has not demonstrated that a failure to review the claim would result in a miscarriage of justice.

Redmond contends that the "cause" of his procedural default was the change of his appellate counsel from his direct appeal and his petition for leave to appeal to the Illinois Supreme Court. Redmond also contends that the replacement of Cook County Defender Rita Fry with Edwin Burnett during his appeal process may have had some bearing on the subsequent change in Redmond's counsel. Redmond has failed to demonstrate that a change in his appellate counsel or the Cook

County Defender was an "interference by officials or unavailability of the factual or legal basis for a claim, which impeded compliance with the state's procedural rule." Furthermore, any change in appellate counsel or the Cook County Defender would not have "caused" Redmond not to file a state post-conviction petition raising his ineffective assistance of appellate counsel claim. Accordingly, Redmond's ineffective assistance of counsel claims are procedurally defaulted.

## CONCLUSION

For the reasons stated above, Redmond's Petition for Writ of Habeas Corpus is denied.

Dated: 9·28·05

JOHN W. DARRAH
United States District Judge